**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES PATTON,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO.  09-4893** |
| **HENRY RICK PASQUALINI and
NEWTOWN TOWNSHIP,** | : | |
| | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                                                              **August 25, 2011**

<u>**M E M O R A N D U M**</u>

### I.      INTRODUCTION

In this case, plaintiff Charles Patton alleges he was forced from his position as a sergeant in the Newtown Township Police Department in 2008 by defendant Henry Rick Pasqualini, the recently hired police chief.  Patton contends that Pasqualini constructively terminated him because Patton spoke out on police department issues at a public meeting of the Board of Supervisors of Newtown Township and/or because Pasqualini disapproved of Patton's service on a Bucks County grand jury.  Patton alleges claims arising under 42 U.S.C. § 1983 ("Section 1983") and state law against Pasqualini and a claim arising under Section 1983 against Newtown Township ("Newtown" or "the Township").  Presently before the Court is defendants' motion for summary judgment.  For the reasons that follow, that motion is granted in part and denied in part.

### II.     BACKGROUND[1]

Patton's employment with Newtown began in 1976, when he was hired as a part-time

---

[1] The facts are presented in the light most favorable to Patton, the non-moving party.

police officer.  (Patton Dep. at 12.)  He became a full-time employee the next year and remained

on the Newtown police force until retiring after the events at issue in this case.  (Id. at 13, 65.)

For virtually all of Patton's tenure with Newtown, Martin C. Duffy served as the

Township's Chief of Police.  Duffy was hired in March 1976 – two months before Patton joined

the force – and retired on April 30, 2008.  (Duffy Dep. at 9-10.)  Duffy and Patton are "very

close friend[s]."  (Id. at 53.)  Pasqualini replaced Duffy as Chief of Police on May 29, 2008.

(Pasqualini Dep. at 170.)

    A.      Patton's Public Comments and Pasqualini's Response

On April 23, 2008, just a week before Duffy retired, Patton attended a meeting of the

Township's Board of Supervisors.  (See Defs.' Mot for Summ. J., Ex. D.)  Dressed in his police

uniform, Pasqualini spoke during the public comment portion of the meeting.  In the course of

his five-minute address to the board, Patton stated:

> I'm here tonight to address some internal issues in our police department.
> I have wanted to speak to all of you for some time.  I have actually asked
> since February to speak to you on behalf of me and others. . . .  I have
> been with this township for 32 years. . . .  I'm eligible to retire.  This is not
> for me.  I can leave today.  I could've left two years ago.  And I ask you to
> listen to the rest of . . . my plea.
>
> The majority of the officers have the same legitimate concerns and
> complaints that I need addressing [sic] as soon as possible.  It behooves
> this board to ask what the needs of our department are, what the needs are
> to be fixed and how it is to be fixed.  One would have assumed, in this day
> and age, knowing with the knowledge for the last five years that Martin C.
> Duffy was going to retire, that we would not wait on the eleventh hour to
> meet with all the personnel before you choose a chief to see . . . what are
> their problems, how can he fix this.  And unfortunately, up until this day,
> we have not been reached out by any township supervisor, none of the
> personnel.  And I also say, in this day and age, you're paying for a
> consultant firm to figure out what you need as a new township police
> chief.  And they haven't reached out.

-2-

Many officers are apprehensive to come forward like I am today, I can assure you, for repercussions within this police department. Why not take the time to meet with us individually – all of us, each and every one of us officers. Me especially, 32 years, I have nothing to gain out of this. Meet with us as a group or individually. This would be beneficial for every one of us and more importantly, [for] all these township residents that rely on us – this is a very difficult job. I myself would like to meet with all of you tonight. . . . My point would be to have an executive session with you tonight and give you some of my points . . . to improve this police department that has been plagued with problems [for] 32 years. So I'm reaching out to you. And I beg you to listen to what I ask for you people to do today. Thank you.

I also have a document that this township in . . . 2000 they did a study . . . this township did a study on what the needs are of this police department. . . . I brought [copies of the study] tonight. And this is an issue that has brought the dissension and plague within the police department. I beg you to read this and understand our plea here. And I really do ask you . . . this is about trust and faith and honor. I've been here 32 years, this is not for me. Thank you.

(Id.) Patton then proceeded to hand out copies of the 2000 study to the members of the board. (Id.)

After Patton distributed the copies of the study, he returned to the podium. Board Chairman Tom Jirele informed Patton that the board had made a "conscious decision" not to seek input from the officers before hiring a new chief. (Id.) Patton responded, "I can't figure out for the life of me – this is an educated group here – you have to reach out and talk to the employees [and ask], 'What went wrong?' 'What continued to go wrong?' 'And how can we fix this?' . . . And I'll tell you the mistake you're making here, with all due respect. This guy's going to come in here and have absolutely no idea what needs to be fixed." (Id.) The dialogue with Jirele and other members of the board continued for about 10 minutes, after which Patton left the podium. (Id.)

Pasqualini testified that he was not in the audience during the meeting. (Pasqualini Dep.

at 41.)  According to Lt. Glenn Forsyth, after Pasqualini became Chief of Police a month later, Forsyth informed Pasqualini about Patton's appearance before the board.  (Forsyth Dep. at 85.) Forsyth also testified that Pasqualini asked him for a video tape of the meeting, and Forsyth said he provided one.  (Id.)[2]

According to Patton, however, Pasqualini told him that Pasqualini was in the audience during Patton's speech.  (Patton Dep. at 22.)  Patton testified that the first time he met with the new chief, Pasqualini expressed his disapproval for Patton's speech to the Board of Supervisors, as follows:

> He said to me when he interviewed me the first time I had seen him, that, in fact, that he was in the audience; and that he heard me. . . .  He said to me specifically that he asked the township supervisors to give him permission to fire me for speaking in front of the township supervisors in April of – April 23rd, 200[8], and that, in fact, he was in the audience.  He said to me, if you ever do that again on my watch, I will fire you.

(Patton Dep. at 22-23.)  Pasqualini acknowledged that he had concerns about Patton appearing at the meeting "in full uniform representing the police department." (Pasqualini Dep. at 47.)  He stated that he believed some officers were upset by Patton's speech, but he further testified that no officers missed work as a result and that the department's functioning was not impaired.  (Id. at 51.)

B.    Patton's Work for the Grand Jury

At the time Patton spoke to the Board of Supervisors, he had already been impaneled on a Bucks County grand jury for more than a year.  Patton was selected for the grand jury on February 23, 2007 and began his regular weekly service on March 1, 2007.  (Duffy Dep., Ex. 1.)

After he was selected for the grand jury, Patton informed then-Chief Duffy of his need to

---

[2] Pasqualini testified that he did not know why Forsyth gave him the tape, implying that Forsyth brought it to him without Pasqualini requesting it.  (Pasqualini Dep. at 42-43.)

appear regularly for grand jury service.  (Duffy Dep. at 13-14.)  Duffy told Patton that Patton should fill out his time sheets as if he had worked his normal 12-hour shift on days when he was scheduled to work but had to attend the grand jury.  (Id. at 14-15.)  Patton was not to return to work on those days, even if his grand jury service ended in fewer than 12 hours.  (Id. at 15.) Other officers who attended court proceedings were required to return to work if the proceedings ended prior to the end of their shifts.  (Id. at 36.)  However, given the secret nature of grand jury proceedings, Duffy believed it would be inappropriate for him to know exactly when or for how long the grand jury was meeting.  (Id. at 36-37.)

     C.    <u>Investigation, Confrontation and Retirement</u>

     After Pasqualini became Newtown's police chief, he learned of Patton's service on the grand jury.  Pasqualini believed it was inappropriate for police officers to sit on grand juries and worried about the time commitment such service entailed.  (Pasqualini Dep. at 24-25.) Pasqualini expressed his misgivings directly to Patton.  (Id. at 23-24.)  According to Patton, Pasqualini told him that "policem[e]n don't belong on grand juries.  I am going to look into this." (Patton Dep. at 67.)

     Shortly thereafter, in July 2008, Forsyth noticed what he believed to be a discrepancy between the amount of leave time Patton said he was going to request and the amount he claimed on his timesheet.  (Patton Dep. at 16.)  According to Forsyth, Patton told him he was doing grand jury work on July 10, 2008, during the time when Forsyth thought Patton would be claiming leave time instead.  (Id.)

     Forsyth brought the issue to Pasqualini's attention.  (Pasqualini Dep. at 53.)  Pasqualini directed Forsyth to investigate.  (Id. at 54.)  Forsyth contacted the Bucks County District

Attorney's Office and learned that the grand jury had not been in session on July 10, 2008. (Pasqualini Dep., Ex. 1.)  Forsyth gathered further information on this issue and prepared a report, dated July 31, 2008, which stated that Patton had claimed to be working for the grand jury on a total of eight days in 2007 and 2008 when he was not doing so.  (Id. at 72; see also id., Ex. 1.)

Armed with the information in the report, Pasqualini contacted Newtown Officer Dan Bell, president of the Police Benevolent Association ("PBA") and advised that there were "some serious questions about Sergeant Patton's appearance at the grand jury and his time sheets."  (Id. at 75.)  According to Patton, Bell later told him that Pasqualini said during that conversation, "I'm firing [Patton]. . . .  He's a thief."  (Patton Dep. at 59.)

Pasqualini then contacted David Zellis at the district attorney's office.  Pasqualini asked Zellis if his office maintained a sign-in log that would reflect all times when grand jury members reported for work.  (Pasqualini Dep. at 72.)  Zellis responded that there were times when grand jury members came to the courthouse to review evidence on their own, but that there was no sign-in log that would document if and when any particular grand juror had done so.  (Id.)  As a result, the district attorney's office lacked complete records of all the times when grand jurors were working.  (Id. at 72-73.)  Zellis told Pasqualini that the district attorney's office would not pursue criminal charges against Patton based on the information available at that time.  (Id. at 103.)

Pasqualini subsequently met with township manager Joe Czajkowski and Phil Whitcomb, the Township's labor counsel, to discuss the investigation.  (Id. at 87.)  According to Pasqualini, Whitcomb suggested that Pasqualini tell Patton that "there were serious questions as to the grand

jury appearances and his time sheets, and to indicate to him that he might want to consider

retiring and putting this behind him." (Id.)

The next day, Saturday, August 2, 2008, Pasqualini summoned Patton to his office for a

meeting with him and Forsyth. The parties dispute what transpired during the meeting. Patton

testified that Pasqualini told him he would be fired and charged criminally if he did not resign or

retire. (See Patton Dep. at 67-68.) Pasqualini, by contrast, stated that he only "told [Patton] the

possibility of charges were on the table." (Pasqualini Dep. at 123.)

The following Monday, August 4, 2008, Pasqualini signed up for a deferred retirement

option program ("DROP").[3] (Patton Dep. at 68.) In November 2008, he informed Pasqualini by

memorandum that he would be retiring as of January 8, 2009. (Id., Ex. 6.)

D.    The Instant Action

On October 23, 2009, Patton filed the instant action, alleging, inter alia, that Pasqualini

forced him to retire because of his speech to the Board of Supervisors and his work on the grand

jury. Patton brings claims arising under Section 1983 and state law against Pasqualini and under

Section 1983 against the Township. Defendants have moved for summary judgment; the motion

is fully briefed and ripe for review.

III.   **LEGAL STANDARD**

In considering a motion for summary judgment, "the court is required to examine the

evidence of record in the light most favorable to the party opposing summary judgment, and

resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d

Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions,

---

[3] Under DROP, an employee earns retirement benefits for a given period while continuing to
work in exchange for a promise to retire at the end of that period. See Lerman v. City of Fort
Lauderdale, Fla., 346 F. App'x 500, 501 (11th Cir. 2009).

conclusory allegations or suspicions" to support its claim.  <u>Fireman's Ins. Co. v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>accord Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

## IV.    DISCUSSION

Although the Complaint is less than precise, it appears to assert the following claims against Pasqualini:[4] (1) retaliation for First Amendment-protected activities, in violation of Section 1983; (2) deprivation of due process, in violation of Section 1983; (3) deprivation of equal protection, in violation of Section 1983; (4) intentional infliction of emotional distress; and (5) defamation.

Patton also asserts a Section 1983 claim against the Township based on a policy of retaliation for First Amendment-protected activities and/or a failure to train its officers in protection of First Amendment rights.

---

[4] Plaintiff has clarified that all claims against Pasqualini are brought against him in his individual, not official, capacity.  (<u>See</u> Pl.'s Resp. to Defs.' Mot. for Summ. J. at 16 n.1.)

As an initial matter, defendants argue that all of plaintiff's claims are barred because he has not exhausted all administrative remedies available to him under the collective bargaining agreement ("CBA") between the Township's police officers and the Township.  As the Third Circuit has held, however, "there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action."  Cnty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 168 (3d Cir. 2006) (citation omitted).  Moreover, defendants have not provided a copy of the CBA or produced any evidence showing that plaintiff could have availed himself of an administrative process in this case.  Thus, defendants' argument regarding exhaustion must be rejected.  The Court next turns to an assessment of the merits of each of plaintiff's claims.

    A.    First Amendment Retaliation Claim Against Pasqualini

Patton contends that Pasqualini retaliated against him for participating in two First Amendment-protected activities: serving on the grand jury and speaking to the board of supervisors.  In evaluating a government employee's First Amendment retaliation claim, courts engage in a three-step analysis.  "First, the employee must show that the activity is in fact protected.  Second, the employee must show that the protected activity was a substantial factor in the alleged retaliatory action.  Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct."  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (internal citations and quotation marks omitted).  Whether the employee's speech was a protected activity is a question of law; assessing causation is a question of fact.  Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).

The determination whether an employee's speech is protected is itself subject to a three-

step analysis:

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made.

Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (citation and internal quotation marks omitted).

In regard to the first step, "[a] public employee does not speak as a citizen when he makes a statement pursuant to [his] official duties." Id. at 242 (citation and internal quotation marks omitted). As to the second factor, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. (citation omitted). Finally, whether the government employer had an "adequate justification for treating the employee differently" is determined by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Rankin v. McPherson, 483 U.S. 378, 384 (1987) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). This test factors "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004) (citations omitted). In balancing the parties' interests, "no single factor . . . is dispositive; they are all weights on the scale." Baldassare, 250 F.3d at 198 (citation and internal quotation marks omitted).

With that legal framework in mind, the Court concludes, for the reasons that follow, that defendants' motion must be granted as to that part of Patton's claim relating to his grand jury service but denied as to that part of his claim relating to his speech to the Board of Supervisors. The Court further denies Pasqualini qualified immunity on the remaining claim.

1.      *Grand jury service*

Patton's claim for First Amendment retaliation based on his grand jury service fails because the mere act of serving on a grand jury does not involve First Amendment-protected expression. To be sure, terminating an employee because of grand jury service is unlawful under Pennsylvania law. See 42 Pa. Cons. Stat. § 4563(a).[5] Moreover, there is no question that one who testifies or appears in court to testify has engaged in a protected First Amendment activity. See Reilly v. City of Atlantic City, 532 F.3d 216, 231 (3d Cir. 2008); Green v. Phila. Housing Auth., 105 F.3d 882, 887 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1291 (3d Cir. 1996). There is no authority, however, for the proposition that mere service on, rather than testimony to, a grand jury constitutes expression at all, let alone protected expression.

Thus, defendants' motion is granted as to that portion of Patton's First Amendment claim against Pasqualini that relates to Patton's grand jury service.

2.      *Speech to the Board of Supervisors*

a.   The Speech Was Protected Expression

Patton's speech to the Board of Supervisors, by contrast, clearly constituted expression. The Court must therefore perform the three-step analysis to determine whether the speech was protected expression. As to the first step – whether Patton spoke as a citizen or pursuant to his

---

[5] Plaintiff has not raised a claim for wrongful termination under state law for dismissal as a result of jury service. See Reuther v. Fowler & Williams, Inc., 386 A.2d 119, 120 (Pa. Super. Ct. 1978).

official duties – the Court must undertake a "practical" examination of plaintiff's position with the Township's police force.  Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Garcetti v. Ceballos, 547 U.S. 410, 424 (2006)).  Further, "a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job."  Id. (quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007)).

In this case, Patton voluntarily attended the meeting while off duty.  He spoke about a subject – the hiring of a new police chief – that was not part of his job duties, either officially or informally.  Moreover, the speech did not involve specific expertise that Patton developed during his service with Newtown; rather, it asserted generally that the township should consult with some of its employees before hiring the new police chief.  It is true, as defendants note, that plaintiff appeared at the Board of Supervisors meeting wearing his police uniform.  However, whether an employee wore his uniform while speaking is not "dispositive" and is only one of the many factors a court considers in assessing whether an employee spoke as a citizen or as an employee.  Foley v. Town of Randolph, 598 F.3d 1, 7 n.9 (1st Cir. 2010).  Even accounting for the fact that plaintiff wore his uniform, the factors discussed above convince the Court that Patton spoke as a private citizen in addressing the Board of Supervisors.

Next, the Court must assess whether the speech involved a "matter of public concern." Speech addresses a matter of public concern when it regards "any matter of political, social, or other concern to the community."  Connick v. Myers, 461 U.S. 138, 146 (1983).  As most speech related to government employment could fall within this broad definition, courts focus on the "content, form, and context of a given statement, as revealed by the whole record."  Id. at 147-48.

-12-

In this case, the content, form and context of Patton's statement all demonstrate that it involved a matter of public concern. The speech addressed matters of interest to all residents of the township: the hiring of a new police chief to replace an outgoing chief and the effective functioning of the police department. See Burne v. Siderowicz, No. 09-4918, 2011 WL 2909191, at *3 (3d Cir. July 21, 2011) (emphasizing that "broad social and political issues, transparency in government affairs, or the effectiveness of government service [are] normally characteristic of an issue of public concern."). Moreover, the speech took place during the citizen comment section of an open and televised meeting of an elected body, a quintessentially public event. Thus, the speech involved a "matter of public concern."

Finally, the Court must balance Patton's interest in speaking and the Township's interest in the effective operation of the police department. That balance strongly favors Patton. His interest in speaking out on an important issue affecting public safety is obvious. By contrast, defendants do not offer any evidence of disruptions or negative impact the speech had on the police department or the services it provides the public other than Pasqualini's generalized statement that some officers were upset about the speech. Based on this balancing of interests, the Township did not have an adequate justification for treating Patton differently than other employees because of his speech. See McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) ("Because no substantial countervailing administrative interest has been proffered, we hold that for summary judgment purposes, McGreevy's speech was protected by the First Amendment.").

As Patton's speech satisfies all parts of the three-step inquiry, the Court concludes that he engaged in an activity protected by the First Amendment.

b.   <u>There Are Genuine Disputes of Material Fact Regarding Causation</u>

Turning next to the question of causation, the Court determines that there are genuine disputes of material fact sufficient to preclude granting defendants' motion as to the retaliation claim against Pasqualini.

As an initial matter, the mere fact that Patton retired and was never formally terminated would not preclude a jury from finding that Pasqualini took negative employment action against him.  Considering the evidence in the light most favorable to Patton, a reasonable jury could conclude that Pasqualini either forced Patton to retire by threat of criminal sanctions and termination, or made working conditions so unbearable for him by a false accusation of theft that Patton could not reasonably be expected to continue working for the Township.  <u>See</u> <u>Levendos v. Stern Entm't, Inc.</u>, 860 F.2d 1227, 1228, 1231 (3d Cir. 1988) (holding that reasonable jury could find that sex discrimination plaintiff was "constructively discharged" from her job where she presented evidence that, <u>inter alia</u>, she was falsely accused of stealing).

A reasonable jury could also conclude that any such negative employment action was motivated in large part by Patton's speech.  Patton's alleged termination came only about two months after Pasqualini became chief and only about three months after the speech itself.  Moreover, according to Patton, Pasqualini specifically told him that he wanted to fire Patton for the speech and would do so if Patton made such a speech while Pasqualini was chief.

Shortly thereafter, when Forsyth brought the timekeeping discrepancy to his attention, Pasqualini ordered an investigation into Patton.  He then called Patton into his office and, at the very least, raised the specter of criminal charges, even though he already knew the district attorney's office would not charge Patton over the timekeeping dispute.

-14-

Given all of this evidence, a reasonable jury could conclude that Pasqualini's actions were motivated, at least in substantial part, by Patton's speech to the supervisors and that his concern over the timekeeping discrepancy was merely a pretext for him to retaliate against Patton for engaging in First Amendment-protected activity. Thus, genuine issues of material fact preclude the Court from granting defendants' motion as to this issue.

### c.   Pasqualini Is Not Entitled to Qualified Immunity

#### i.   *Legal Standard for Qualified Immunity*

Finally, the Court must assess whether Pasqualini is entitled to qualified immunity on Patton's First Amendment retaliation claim. The doctrine of qualified immunity provides that government officials are immune from suits for civil damages under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because it attempts to protect innocent officials from litigation, qualified immunity represents an "accommodation of competing values." Id. at 814. In light of the competing values at stake, the Supreme Court and the Third Circuit have emphasized that the qualified immunity analysis takes into account the totality of the circumstances as it appeared to each individual defendant at the time of his challenged conduct. Maryland v. Garrison, 480 U.S. 79, 85 (1987) (noting that the constitutionality of officers' conduct must be evaluated "in light of the information available to them at the time they acted"); Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).

The availability of qualified immunity is a question of law to be decided by the court. Curley, 499 F.3d at 211. Determining whether a defendant is entitled to qualified immunity requires two inquiries, which can be taken in either order. Pearson v. Callahan, 555 U.S. 223,

236 (2009).  The first is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  Id. at 816 (internal citations omitted).   The second is "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id.  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Reedy v. Evanson, 615 F.3d 197, 224 (3d Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).  "This inquiry turns on the objective legal  reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  Pearson, 555 U.S. at 244 (citation and internal quotation marks omitted).

The objective reasonableness test for qualified immunity requires consideration of "the information within the officer's possession at that time."  Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 194 (3d Cir. 2005) (citing Anderson v. Creighton, 483 U.S. 635 (1987)).  Orders or advice from superiors are not sufficient, standing alone, to confer qualified immunity where an officer should know that his actions are illegal.  See, e.g., Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir. 1998).  However, "[p]lausible instructions from a superior or fellow officer can support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists."  Harvey, 421 F.3d at 199 (Becker, J., dissenting) (internal quotation marks omitted) (quoting Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000)); Audio Odyssey v. Hofmann, 245 F.3d 721, 737-38 (8th Cir. 2001) (discussing reliance on legal advice as part of reasonableness analysis).

ii.   *Analysis*

Viewing the evidence in the light most favorable to Patton, he suffered retaliation for exercising his First Amendment rights; the only question is whether it should have been clear to a reasonable officer in Pasqualini's position that his conduct was unlawful. The Court concludes that plaintiff's right to address the Township supervisors without suffering retaliation was clearly established at the time Pasqualini took his allegedly retaliatory actions. Accordingly, Pasqualini is denied qualified immunity as to this claim.

The right of public employees to speak out on matters of public concern not stemming directly from their job duties dates back decades. See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Although such right is subject to balancing against the interests of the government in operating effectively and efficiently, the record in this case is devoid of any evidence of disruption in the police force that would justify disciplining Patton because of his speech.

Defendants contend that Pasqualini is nonetheless entitled to qualified immunity because he relied on the legal advice of Whitcomb before confronting Patton about the timekeeping discrepancies. This argument must fail. If the investigation into Patton's timekeeping was a pretext to retaliate against Patton for his speech, then it is of no import whether Whitcomb, who would not have known of Pasqualini's true motivations, suggested the chosen course of action.

In sum, Pasqualini is not entitled to qualified immunity on Patton's claim that Pasqualini retaliated against him for exercise of his First Amendment rights. Defendants' motion for summary judgment is denied as to that part of Patton's claim that addresses whether Pasqualini retaliated against him for his speech to the Board of Supervisors.

-17-

B.      Due Process in Termination

Patton next alleges that Pasqualini violated his Fourteenth Amendment right to due

process by effectively terminating him without giving him a chance to respond to the charges

against him.  To prevail on a claim under Section 1983 for deprivation of procedural due process

rights, a plaintiff must prove that "(1) he was deprived of an individual interest that is

encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and

(2) the procedures available to him did not provide 'due process of law.'"  Hill v. Borough of

Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d

Cir. 2000)).

As an initial matter, The Third Circuit has held that a resignation or retirement, like the

one at issue in this case, "will be deemed involuntary (i.e., deemed a constructive discharge) and

will thus trigger the protections of the due process clause, and form the basis of a § 1983 due

process claim, under only two circumstances: (1) when the employer forces the employee's

resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation

or retirement by deceiving or misrepresenting a material fact to the employee."  Id. at 233 n.10.

In this case, based on Patton's allegation that Pasqualini told him he would be charged criminally

if he did not retire – as well as Pasqualini's alleged misrepresentation that criminal charges could

still be brought even after Zellis stated that the district attorney's office would decline to

prosecute Patton – a reasonable jury could conclude that Patton was constructively discharged, in

which case the protections afforded under the Due Process Clause would attach.

Turning to the two-step analysis above, "[t]o have a property interest in a job . . . a person

must have more than a unilateral expectation of continued employment; rather, she must have a

legitimate entitlement to such continued employment." Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005). In Pennsylvania, police officers of second class townships, such as Newtown, cannot, with certain exceptions not applicable, be "suspended, removed or reduced in rank" unless one of five enumerated conditions is met. 53 Pa. Stat. §§ 812, 66912. The Third Circuit has found that a nearly identical statutory provision governing police officers and firefighters who work for boroughs entitles those employees to due process protections. Dee v. Borough of Dunmore, 549 F.3d 225, 230 (3d Cir. 2008). Accordingly, Patton had a legitimate entitlement to continued employment sufficient to require that the dictates of due process be followed in his alleged termination.

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) (citation and internal quotation marks omitted). Although there is no precise formula for what procedures must be afforded, "[a]n essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id. at 542 (citation and internal quotation marks omitted).

In this case, if a jury believed Patton's version of events – that Pasqualini threatened him with termination and criminal charges if he did not retire without giving him prior notice of the allegations against him or a chance to respond to them – it could reasonably conclude that he had been deprived of his position without due process of law. Thus, a reasonable jury could conclude that Pasqualini deprived Patton of his right to procedural due process.

Finally, given the well-established nature of the due process right to notice and a chance to be heard, it is clear that the right Pasqualini is alleged to have violated was clearly established

-19-

at the time of Pasqualini's confrontation with Patton.  Pasqualini's assertion that he relied on the advice of labor counsel Whitcomb in confronting Patton cannot shield him from liability.  A reasonable officer in Pasqualini's position would have known that some form of notice and hearing was needed before Patton could be terminated, as Pasqualini has already acknowledged. (See Pasqualini Dep. at 148-49 ("The matter should have been handled by the book, by the number, you know, that, in fact I would have went through the whole process . . . and done a Loudermill hearing.").)  Thus, Pasqualini is not entitled to qualified immunity on Patton's due process claim.

In sum, the Court denies defendants' motion for summary judgment as it relates to plaintiff's claim that Pasqualini terminated him without affording him due process.

### C.    Equal Protection

In his briefing on the instant motion, plaintiff concedes that he cannot make out a claim for violation of his equal protection rights.  (Pl.'s Resp. to Defs. Mot. for Summ. J. at 18.)  Thus, the Court grants defendants' motion as to that claim.

### D.    Intentional Infliction of Emotional Distress

Patton also asserts state-law claims for intentional infliction of emotional distress and defamation against Pasqualini.  "The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another."  Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010).  In Pennsylvania, to succeed on a claim of intentional infliction of emotional distress, "a plaintiff must support the claim of emotional distress with competent medical evidence, in the form of expert medical evidence."  DeBellis v. Kulp, 166 F. Supp. 2d 255, 281 (E.D. Pa. 2001).

Patton has produced no evidence, other than his own testimony, about the emotional damage he suffered as a result of the events leading up to his retirement.  Therefore, defendants' motion is granted as to Patton's claim of intentional infliction of emotional distress.

      E.     <u>Defamation</u>

The Court turns next to plaintiff's claim that Pasqualini defamed him in his comments to PBA President Bell.  "Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her."  <u>Moore v. Cobb-Nettleton</u>, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) (citation omitted).  A plaintiff has the burden of proving:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a).

      1.    *Special Harm*

There is no question that plaintiff has provided sufficient evidence of the first five factors to survive summary judgment.  As to the sixth factor, "special harm" is defined as "actual damages which are economic or pecuniary losses."  <u>Sprague v. Am. Bar Ass'n</u>, 276 F. Supp. 2d 365, 368 (E.D. Pa. 2003).  Special damages are distinct from general damages, which "refer to those that typically flow from defamation, such as impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."  <u>Id.</u> (citation and internal quotation marks omitted).

-21-

Where, however, a plaintiff can prove that the defamatory statements constituted "slander per se," he need only prove that he suffered general damages.  Pennoyer v. Marriott Hotel Servs., Inc., 324 F. Supp. 2d 614, 618 (E.D. Pa. 2004).  "There are four categories of words that constitute slander per se: words that impute (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct."  Id. (citation omitted).  The first and third categories are potentially applicable in this case.  "A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment."  Clemente v. Espinosa, 749 F. Supp. 672, 679 (E.D. Pa. 1990) (citation omitted).  A statement constitutes an allegation of business misconduct if it "ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office."  Id. at 677 (quoting Restatement (Second) of Torts § 573).

In this case, plaintiff has provided evidence that Pasqualini told Bell that Patton stole funds from the Township by falsely claiming he was serving on the grand jury on days when he did not serve.[6]  In Pennsylvania, theft is a crime punishable by imprisonment.  See 18 Pa. Cons. Stat. §§ 1103-1104, 3903(a)-(b).  Additionally, an allegation of stealing "strikes at the heart" of an individual's "credibility, honesty, and integrity," qualities necessary for success in many fields, including law enforcement.  See Tarquini v. Gorberg, No. 09-492, 2010 WL 3522140, at

---

[6] Although Patton's testimony about Bell's statements to him constitute inadmissible hearsay, see Fed. R. Evid. 801(c), 802, "the Third Circuit has held that hearsay evidence may be considered at the summary judgment stage if the declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial."  Rossi v. Schlarbaum, 600 F. Supp. 2d 650, 665 (E.D. Pa. 2009) (citation and internal quotation marks omitted).  Defendants have proffered no evidence that Bell would not be available to testify at trial or would testify differently than Patton stated.  Thus, the Court can consider Patton's testimony about Bell in addressing the instant motion.

*3 (E.D. Pa. Sept. 9, 2010). Thus, plaintiff has provided evidence sufficient to recover on a theory of slander per se and need only prove general damages.

Plaintiff has provided some evidence of reputational harm and humiliation because of the accusation against him.  (See Patton Dep. at 68, 70.)  Accordingly, plaintiff has adduced sufficient evidence of damages to survive summary judgment on his defamation claim.

### 2.  *Conditional Privilege*

The Court turns next to the question whether Pasqualini's conversation with Bell was "conditionally privileged" and, if so, whether Patton has provided sufficient evidence that the privilege was abused for the claim to be submitted to a jury.  In Pennsylvania, a conditional privilege attaches to comments made where "an employer's workers communicate with each other in connection with the discipline, including termination, of a fellow employee.  The workers relaying the purportedly defamatory information must be involved in the disciplinary matter at hand."  Foster v. UPMC S. Side Hosp., 2 A.3d 655, 664 (Pa. Super. Ct. 2010).  Where a conditional privilege attaches, the speaker cannot be held liable for defamation, so long as the privilege was not abused.  Moore, 889 A.2d at 1268; accord Restatement (Second) of Torts § 593.  A privilege is abused when:

> the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.  Finally, cases which have held that a conditional privilege can be lost by negligence are restricted to matters which are not of a public concern.

Moore, 889 A.2d at 1269 (internal citations and quotation marks omitted).

Patton alleges that Pasqualini defamed him by telling PBA President Bell, an officer in the police department, about the investigation into Patton's timekeeping practices. It is apparent from the record that Pasqualini called Bell in his capacity as PBA president because of potential disciplinary action that was about to be taken against one of his members. Accordingly, Pasqualini's statements to Bell were conditionally privileged.

There is, however, evidence that Pasqualini abused the privilege. According to Patton, Bell told him that Pasqualini called Patton a "thief" during their conversation. A reasonable jury could conclude that such a derogatory statement was not "necessary for the accomplishment of the purpose" of the phone call, which was only to alert Bell to the possibility of disciplinary action. Thus, Patton has adduced sufficient evidence from which a reasonable jury could conclude that Pasqualini abused the conditional privilege that attached to his conversation with Bell.

Accordingly, defendants' motion for summary judgment is denied as to plaintiff's defamation claim.

F.    Monell Claim Against Newtown Township

Plaintiff next contends that the Township should be held liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for creating a policy of violating employees' First Amendment rights and for failing to properly train Pasqualini regarding employees' First Amendment rights. The Court grants defendants' motion as to this claim.

1.   *Plaintiff's Argument That The Township Maintained a Policy or Custom Actionable Under Monell*

Generally, a municipality is not liable for its official's or employee's violations under Section 1983. Id. at 694. However, a municipality can be held liable under Section 1983 when

"those whose edicts or acts may fairly be said to represent official policy" adopt a "policy or custom" resulting in an actionable Section 1983 injury.  Id.  A municipality establishes a policy when an official with "final authority . . . issues an official proclamation, policy, or edict[,]" and establishes a custom when the "practices of state officials [are] so permanent and well settled as to virtually constitute law."  Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (brackets in original) (citation and internal quotation marks omitted).  After establishing that a government policy or custom exists, a plaintiff must "establish that the government policy or custom was the proximate cause of the injuries sustained."  Id. at 1213.  In doing so, a plaintiff must show a "plausible nexus" or "affirmative link" between the policy or custom and plaintiff's alleged injury.  Id.

Plaintiff argues, incorrectly, that Pasqualini is a "decision maker with final authority" whose actions represent an official policy for which the township should be held liable.  Whether an official has final authority to establish policy is a question of state law.  Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).  Under Pennsylvania law, a police chief does not have such authority.  Santiago v. Warminster Twp., 629 F.3d 121, 135 n.11 (3d Cir. 2010); see 53 Pa. Stat. § 66902.

Moreover, plaintiff also fails to provide any evidence of a custom that the Township maintained, and has not specified what exactly the alleged custom entailed. Instead, plaintiff only vaguely claims that Pasqualini's "adverse actions" against plaintiff represented a custom or policy.  (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 15.)

Without either a policymaker or a policy, plaintiff's argument that his injuries were caused by a Township custom or policy created by Pasqualini fails.

-25-

2.  *Plaintiff's Argument That The Township's Lack of Training Constituted an
Actionable Policy Under Monell*

A municipality also may be held liable under Monell for having a policy of failing to

adequately train its police officers.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).

To advance such a claim, a plaintiff must establish that a municipality's policy or custom of

providing inadequate training represented a "deliberate indifference" towards individuals'

constitutional rights.  Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 124 (3d Cir.

2003).  The policy or custom of indifference must also be the "moving force behind the [alleged]

constitutional violation."  Id. at 125.

To demonstrate a municipality's deliberate indifference, a plaintiff must provide evidence

that the alleged failure to train has caused a "pattern of violations."  Kelly v. Borough of Carlisle,

622 F.3d 248, 265 (3d Cir. 2010).  If a plaintiff cannot show such a pattern, his burden of proof

becomes even higher: he "must show that a violation of federal rights was a highly predictable

consequence of a failure to equip law enforcement officers with specific tools to handle recurring

situations."  Id. (citations and quotations omitted).

Plaintiff's only support for the alleged policy of inadequate training is Pasqualini's

testimony he was not trained regarding employees' First Amendment free speech rights.  Patton

provides no evidence of a pattern of violations that resulted from this lack of training, nor has he

produced any evidence that would demonstrate that it was highly predictable that a lack of First

Amendment training would lead to a violation of his federal rights or that his situation is one that

could fairly be characterized as "recurring."  Accordingly, plaintiff's theory of municipal liability

based on a failure to train is unavailing.

In sum, there is no evidence of any sort of policy or custom – or indifference that could

-26-

be characterized as a policy or custom – on the part of the Township that led to plaintiff's injuries.  Therefore, the Court grant defendants' motion as it relates to the <u>Monell</u> claim.

      G.   <u>Punitive Damages</u>

Finally, plaintiff seeks punitive damages in this case.  Municipalities, such as Newtown, are "immune from punitive damages under 42 U.S.C. § 1983."  <u>Smith v. Borough of Dunmore</u>, 633 F.3d 176, 183 (3d Cir. 2011) (quoting <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981)).  However, punitive damages may be recovered against an individual defendant "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  <u>Carey v. City of Wilkes-Barre</u>, 410 F. App'x 479, 482 (3d Cir. 2011) (citation omitted).

On the record as it stands, the Court concludes that it is premature to decide whether a reasonable jury could award punitive damages against Pasqualini.  The Court thus defers ruling on the issue of punitive damages until after plaintiff presents his case in chief at trial.  Until the Court rules, neither party will be permitted to reference punitive damages or punishing defendant Pasqualini in the presence of the jury, nor will either party be permitted to mention Pasqualini's financial assets in the presence of the jury.  However, defendant Pasqualini must be prepared to produce evidence of his net worth at the conclusion of plaintiff's case-in-chief in the event the Court rules that the issue of punitive damages should be submitted to the jury.

## V.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part.  The motion is granted as to plaintiff's claims against Pasqualini for First Amendment retaliation based on Patton's grand jury service, violation of Patton's equal

protection rights and intentional infliction of emotional distress.  The motion is also granted as to plaintiff's <u>Monell</u> claim against Newtown.  The motion is denied in all other respects.  The only remaining claims are Patton's claims against Pasqualini for First Amendment retaliation based on Patton's speech before the Board of Supervisors, termination in violation of Patton's due process rights and defamation.  The Court defers ruling on the issue of punitive damages against Pasqualini until plaintiff has presented his case-in-chief at trial.  An appropriate order follows.